Our fifth case for today is Love v. JP Cullen & Sons. Ms. Kistenbroker. Good morning, Your Honors, and may it please the Court, Counsel. This is a case involving summary judgment, and we submit that on appeal, the District Court's decision should be reversed because it misapprehended this Court's precedent on the issue of indirect employers under Title VII. We submit that there is a material issue of fact as to Cullen's status as an indirect or de facto employer, and I'm speaking specifically about the District Court's opinion where they're discussing that the precedent on this issue is unsettled or unclear. We submit that it is clear. The Seventh Circuit's cases of Hinemeyer v. Worth, EEOC v. Illinois, and Tamayo are all very clear that the economic realities of the relationship between plaintiff and defendant must be examined. I don't think there's that much difference among these tests. I mean, I'll tell you what bothers me about your position. It appears to me that Mr. Berenson, working for the general contractor, does no more or less than tell the sub-subcontractor, UCI, we don't want Mr. Love on this project. He's not firing Mr. Love from UCI. He's not telling UCI they can't use Mr. Love on hypothetical other projects. It's really not his concern how much other work UCI has. So I am worried that you're equating saying you can't work on a particular project, the Milwaukee City Hall, with actually the power to fire. That's a very good point, Your Honor, and we don't wish to confuse those issues. We don't dispute that Don Berenson simply removed my client from the job site. However, what is troubling is that he made that decision over his direct employer, Scott Henninger's wishes. But why? But Cullen had reserved the right to control the general job site, and you can easily see why a general contractor has to do that. If employees of subcontractors are engaged in dangerous practices that are going to yield OSHA violations, that might be a reason to say, you know, we just don't want this person here. We don't want to fuss around with training. If there's a fight, as allegedly there was here between Mr. Love and the other employee, maybe they say we don't want that kind of person on the site because that's a bad thing. So I just don't see where Cullen has actually fired Love from his employer. Well, the issue is that UCI did not have any other project sites to transfer my client to. No, I understand that, but that's kind of a secondary problem, isn't it? I think it all kind of ties together in a big package. Do we know that Berenson knew that or cared about it? I mean, it could be that UCI would have gotten another project after the City Hall project. I guess, you know, as it happens, things didn't work out for Mr. Love on this work. But that doesn't mean that Cullen fired him from his job at UCI. He got his paychecks, right, from UCI. He gets his work assignments from them. He did for the time that he worked, Your Honor. What is troubling also is that my client was unable to secure a similarly situated position that's commensurate with his experience with other contractors after this incident. There's evidence in the record that at least one other contractor or potential employer knew about this incident. And he thinks that he's been blackballed in this trade because of Cullen's decision to override UCI's opinion that he was a valued worker. Yeah, Henninger wanted to keep him there, and Berenson says no. But I don't know how far you can go with that. Anyway, you can continue. Well, I guess this all boils down to that there's a right way to do this and a wrong way. And the right way would have been to allow UCI to remedy the situation and enact whatever discipline they saw was appropriate towards Mr. Love. Wouldn't that be a contractual matter between Cullen and maybe EMI and UCI to see how problems that arise on this work site are going to be resolved? The main issue, I think, in answering your question, is that Cullen didn't need to reserve this power to themselves. They took it upon themselves to be the sole entity allowed to investigate incidents of misconduct and then discipline them without really much involvement from a subcontractor. The immediate employer. Yes, Your Honor, the immediate employer. And they didn't really respect UCI's individual entity status. On a construction site, there can be a lot of different cooks in the kitchen, so to speak. And what we take issue with is that Cullen did not respect UCI's ability to discipline their own employees, and Cullen took it upon themselves and reserved the authority to do so when there's no indication that removal was necessarily the most appropriate remedy in this case because my client was not the aggressor in this particular altercation that took place. Which brings me to my other point that the five-factor test is viewed from a different lens as the economic realities test. The five-factor test tends to look at things through the lens of agency and examining whether or not a defendant had control over a plaintiff to prevent harm to somebody else or whether or not they were an independent contractor. And Cullen acknowledges that love status as an independent contractor wasn't at issue, that that test doesn't quite fit the bill in this case. We believe that the economic realities test would be more appropriate in this situation because, firstly, the Seventh Circuit's four most recent cases on this issue have solely examined the economic realities of the situation and haven't really addressed five factors. And the cases cited by Cullen in support of their position rely on the five-factor test. And we don't believe that's appropriate given the Seventh Circuit's abandonment, essentially, of the five-factor test in favor of economic realities, which keeps in mind the remedial purpose of Title VII and looking towards the substance of the relationship rather than necessarily who is giving benefits or the labels of each person involved in the relationship. The key language I'd like to point out also is from EEOC v. Illinois as to who is pulling the strings in the background, and a jury should be allowed to decide in this case whether or not Cullen is the one really pulling the strings in the background and calling the shots in this case. When UCI's hands were really tied, they were given a choice. They'd either remove Mr. Love or you're all off the project site, and that's really not a good position to be in. Yes, Your Honor. And then the other language I would like to direct the court to is the language in Tamayo and Worth where the court said the entity who directed the act, practice, or policy that's discriminatory in nature, that's being complained of, is an appropriate defendant for purposes of Title VII. And in this case, Cullen is the one who's calling the shots. They're the ones who are only investigating, interviewing the different witnesses, and making decisions and conclusions based upon those interviews and then enacting discipline over the wishes of a direct employer in this case. We submit also that this case is more similar to Tamayo, Worth, and Heinemeier than any of the other cases that have been addressed in the briefing of this issue because even though these entities are not affiliated in a corporate sense, they are intertwined in the sense that they're both working on the same project and working towards the same common goal, and there is no requirement in Tamayo, Worth, or Heinemeier that these entities need to have some sort of formal corporate affiliation. And I believe that was raised in Cullen's brief, and we contend that's not necessary for the court to be applying economic realities as an assessment to who should be in direct or de facto employer under Title VII. And then another point that I would like to address is interference liability. We acknowledge that interference liability is not a tenable cause of action in this circuit, and we don't contend this is an interference liability case. Cullen has contended that at most we can prove interference liability at best, and we don't believe that's the case because in interference liability, someone is forcing a direct employer's hand in a sense. Here Cullen is taking it upon themselves to be the judge and the jury in a sense of figuring out what happened and what the appropriate remedial action may or may not be. If they had left the decision to UCI, that would avoid this whole issue and wouldn't open them up to Title VII liability as a potential question. Okay. Well, if you want to save a minute for rebuttal. I would. Thank you, Your Honor. Sure. Ms. Garrig-Woodman? May it please the Court? Opposing counsel? Your Honors, I guess I'd like to start off addressing a couple of the arguments that were made by opposing counsel simply because that's where my mind ends up at the conclusion of her argument. One thing that opposing counsel indicated is that interference liability involves forcing an employer's hand. And, Your Honors, it appears that that would tie right back to her comments when she was contending that UCI did not want to exclude Mr. Love from the site, but J.P. Cullen did. Well, her argument essentially is a very straightforward one. Had it not been for J.P. Cullen's decision, Mr. Love would have continued working on the job site. He would have continued working for UCI because his employer had assessed what had happened and had made its decision about who was responsible for what. And, essentially, in this pull-the-strings sense, it's Mr. Berenson who says, you've got to get rid of this guy. And that is, in fact, a direction to fire him at least from this job site and, in fact, de facto from his work. So I don't see anything about the fact that this happens to be a contractual link among the employer chain from general to sub to sub-sub as opposed to an equity link with affiliated corporations. That strikes me as really quite beside the point from the policy point of view of Title VII. So is it your position that a general contractor can never be the de facto employer of the employee of one of the subs? Your Honor, it's my position on behalf of Cullen that certainly it's impossible to say never. And I think that saying never is a very dangerous thing to say in a court or any other context. But, Your Honor, certainly under the context of this case, J.P. Cullen reserved the right to preserve the safety and productivity of its work environment. And to that end, basically the only control that my client exercised over Mr. Love or any other employee of a subcontractor or one of its subcontractors was to maintain the safety, security, and productivity of its work environment. Right. And everybody understands that. I think the question is in so reserving those rights, did J.P. Cullen become the de facto employer of the employees of the other companies that were working on the site, either as subcontractors or sub-subcontractors or whatever? In other words, you have to take the bad with the good situation. And, Your Honor, to that I would say absolutely not. There are so many contexts in which some type of an overseeing authority has to maintain order and decorum, for example, in a courtroom. The person or the people or the staff who are responsible for maintaining order, decorum, safety, and productivity in this courtroom do not become the de facto employers of everybody who comes before this court. I think that that would be an absurd extension of Title VII liability. Well, I mean, so the question that we're at, I mean, we're at a very preliminary stage in this case. Is J.P. Cullen an entity that can be held responsible for what went on? We haven't reached, I mean, so supposed to take a hypothetical, I hope not this case, you know, J.P. Cullen announces to all of its subcontractors that it wants them to hire only white people, so presumably it wouldn't do that. But if it did, would it be your position that somebody who was fired, you know, Hispanic or an African-American or somebody else who's fired by the subcontractor because they want to stay in the project has no claim against J.P. Cullen? Your Honor, I think that the case that I'm drawing upon is the EEOC versus the State of Illinois, Illinois, excuse me, in which it was noted that if the employer, if the direct employer allowed the employee to be subjected to those conditions, then the employee would have a cause of action against his or her direct employer. But the most that they could assert, my reading of that case, is the most they could assert is an interference liability claim against the contractor and that that, as conceded by opposing counsel, is not a tenable claim in the Seventh Circuit. So you're saying essentially that there is no claim in the Seventh Circuit in a situation where J.P. Cullen hypothetically says to the ABC company, we don't want you to hire anybody but white people. Your Honor. And they fire all the people who aren't. As abhorrent as that suggestion is, I don't think that it would give rise to a Title VII claim against J.P. Cullen. That's surprising to me that with that kind of control saying who you can hire and who you're going to fire. And Your Honor, I guess I need to contract a little bit. I was thinking along one line and in this case J.P. Cullen did not choose who the contractors and, excuse me, who EMI or EMI subcontractors hired. They did not choose who they fired. They only chose for safety and productivity reasons who could remain on the job site. On the job site. Okay. And I guess to go back to it may be helpful or it was helpful for me in framing my argument to talk about what Mr. Love is claiming and what Mr. Love is not claiming. Obviously Mr. Love is not claiming that J.P. Cullen was his actual employer. Mr. Love is not claiming that J.P. Cullen should be held liable to him under a theory of interference liability. What he is claiming is that J.P. Cullen exercised sufficient control over him to be considered his de facto or indirect employer for purposes of Title VII. Your Honor has already pointed out, and I guess that I can wholeheartedly agree, that these tests seem to kind of blend to me and a court might cite one that relies on another test and it seems what it all boils down to is sure. You know, the Austin, the Knight case were the cases that dealt originally with the five factor test and articulated those very clearly in the context of is this employer or is this subcontractor. But then the other cases when they started talking about economic realities, you know, and those were the affiliated entity cases. And those were cases, in my mind, I think of those as kind of the shell game cases. Some members of this court don't like five factor tests anyway. I mean, you're trying to look at what's the ultimate question we're trying to get at, which is why you wind up with phrases like economic reality. Yes, Your Honor. And I guess it's our position that under any of those tests and certainly under the more recent cases that have been decided, J.P. Cullen did not exercise sufficient control over Mr. Love's day to day activities. Basically, although if we characterize what they did is firing, that's a pretty major thing to do to somebody. You think of Vance against Ball State, the Supreme Court decision, power to hire, fire, promote, give raises to. These are all the core powers of an employer. No question, Your Honor. And what we're saying is that number one, we didn't hire. We didn't pay. We didn't compensate. We didn't set work hours. We didn't control the day to day, his tasks on a day to day basis. The only thing that we did is reserve the power to exclude from the job site. He could have been laid off and somebody else could have hired another job. I assume, I don't know, but I assume that union contracting is still in operation. They didn't call him back. They could have hired, excuse me, they could have laid him off. They could have terminated him or they could have transferred him to another job site. Your Honor, I don't believe it's in the record that union didn't have anything, any other place to put him. It may be in the record. I may simply not be recalling it at this moment, but J.P. Cullen took no position with regard to that. You know, we take issue with the allegations that he was blackballed by my company, by J.P. Cullen, that I don't believe is essential or particularly material to this court's determination. But we definitely take issue with that. We do not concede that. Your Honor, just going through, you know, you read so many cases, but some of them do kind of stick out. And some of the more recent cases within the trial court where they've talked about in which cases this indirect or de facto liability, one that really sticks out in my mind is the Atkins case. In that case, Your Honor, there was so much power that was reserved to the entity that was ultimately found to be sufficient evidence to find that there could be a de facto or indirect employment relationship, that it really stands out from the other cases in which it was found that no such relationship could exist. For example, the Foster Wheeler case and the Fly case. In Atkins, they reserved the right to control every aspect of his day-to-day duties. They controlled his compensation. And in fact, they ended up directing his true employer to fire him when he was fired. So to me, that's the indirect or de facto employment relationship, where the true person or entity pulling the strings is not necessarily the one that shows up as the employer, perhaps in the W-2. But in this case, none of that was going on. And Foster Wheeler is right on point with the facts. They controlled entry to the work site, and they retained the right to remove people that were disruptive. And again, in Fly, we've got, again, the general contractor. And it was found that even though they had safety meetings, like J.P. Cullen did in this case, that there was insufficient indicia of control to find that there was sufficient evidence that it could be a direct or de facto employment relationship. Winding up, Your Honors, unless there's further questions, I just wanted to address the cases that were cited in the appellant's reply brief. We were talking about master-servant cases in that. And I had to read that brief, I confess, a couple of times to get my head around why those were being tied in here. And what it came to, in my mind, is the appellant is talking about discipline and talking about how appellant, or excuse me, master-servant cases could somehow be relevant to this case because there was some aspect of discipline. Your Honor, I need to reinforce the point. My client was not disciplining Mr. Love. Mr. Love was subject to discipline by his true employer, UCI. My client was simply maintaining the safety and the productivity on the worksite. They did not have the power to discipline Mr. Love. They had the power to enforce their limited powers to maintain safety and productivity on the worksite. Okay. Thank you, Your Honors. Thank you very much. Anything further, Ms. Kistenbroker? Yes, Your Honor, there are a few points I'd like to touch on. Firstly, it sounded like we were speaking about control as being a core power to hire and fire. It sounds like, but for Cullen's decision to remove my client from the job site, UCI wouldn't have done anything. Scott Henninger's affidavit states that he was a valued and qualified worker, and there's no indication that removal from a project site would have been acceptable discipline for him. Ms. Kistenbroker, what if Cullen said to UCI, after this incident, I don't want any trouble on my site. Didn't exercise that ultimate authority. But UCI says, well, I'm going to shift you to another job site. You're not staying on this site because I don't want to endanger my relationship with Cullen. Would that be actionable? Not under Title VII, Your Honor. Our position is that an entity like Cullen, who wishes to exact discipline on an employee that's not directly linked to them, would be to go to that worker's direct employer and allow them to handle the situation. And if it weren't handled correctly, then they could step in. In your example, it sounds as if they're merely expressing their disappointment or dismay. But the disappointment is so strong that the sub says, I don't want to risk anything. I'm going to read that as Cullen basically saying, remove both. In your example, it sounds like it would be more akin to an interference liability case, where they're sort of trying to influence the direct employer's decision. But in this case, Cullen was the one who called the shots, and that's not disputed. And the district court acknowledged that in their opinion, that no one's saying that Cullen didn't remove him from the job site. Another example that my opponent gave was someone who is charged with maintaining decorum in the courtroom would not be a direct or indirect or de facto employer. I submit that it would be if there was a case where a black person was thrown out of the courtroom for certain behavior and a white person was not. Just the fact that you're charged with maintaining decorum in the courtroom doesn't mean that you're allowed to discriminate, obviously. In this case, that's what happened here. There's evidence that white workers on the job site were permitted to remain on the job site or transferred or faced lesser discipline than my client, who was not the aggressor in this particular situation and was removed from the job site anyway. And I know we're not asking the court to decide whether or not discrimination occurred, but we are asking a jury to decide that. If there are no further questions, we ask that this court reverse the district court's decision. Thank you. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement.